IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

**MARCUS A. LEITHEISER**,

      Plaintiff,

      v.

**MICHAEL J. ASTRUE**, **Commissioner
of Social Security,**

      Defendant.

Case No. CV 10-6243-SI

**OPINION AND ORDER**

Drew L. Johnson
1700 Valley River Drive
Eugene, Oregon 97401

Linda S. Ziskin
P.O. Box 2237
Lake Oswego, Oregon 97035
     Attorneys for Plaintiff

Amanda Marshall
United States Attorney
Adrian L. Brown
Assistant United States Attorney
U.S. Attorney's Office
District of Oregon
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204

Opinion and Order, Page 1

Willy M. Le
Special Assistant United States Attorney
Social Security Administration
Office of General Counsel
701 Fifth Avenue, Suite 2900
M/S 221A
Seattle, Washington 98104
         Attorneys for Defendant

**SIMON, District Judge.**

# I.  INTRODUCTION

This is an action to obtain judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying the application of Marcus Leitheiser for Supplemental Security Income benefits ("SSI"). Mr. Leitheiser alleges disability on the basis of orthopedic impairments, primarily involving his low back, and depression. The court reverses the Commissioner's decision for failure to make adequate credibility findings and improperly rejecting evidence from an occupational therapist that the Commissioner was specifically instructed to consider by both the district court and the Appeals Council ("AC"). This case is remanded for the payment of benefits.

# II.  BACKGROUND

Mr. Leitheiser filed an application for benefits on November 15, 2004, alleging disability since October 22, 2004. His claim was denied initially and upon reconsideration. A hearing was held before Administrative Law Judge ("ALJ") William Philip Horton on June 13, 2007. On August 23, 2007, the ALJ issued a decision finding Mr. Leitheiser not disabled. The AC denied review. Mr. Leitheiser sought judicial review in this court, which reversed the decision of the ALJ and remanded the case for further proceedings, based the parties' stipulation. A second hearing was held before ALJ Marilyn S. Mauer. On April 14, 2010, ALJ Maurer issued a

Opinion and Order, Page 2

decision finding Mr. Leitheiser not disabled.  When the AC denied review, the ALJ's decision

became the final decision of the Commissioner.

Mr. Leitheiser was born in 1969 and was 35 years old at the time of his alleged disability

onset date. He has a sixth grade education. Mr. Leitheiser was deemed to have no past relevant

work because his work experience was not performed within the last 15 years. Tr.270.[1]

## A.    Medical Evidence

Mr. Leitheiser injured his back in 1992 while carrying 200 pounds. Tr. 18. Since 1992,

Mr. Leitheiser has had at least four back surgeries, including a laminectomy, discectomies, and

fusions. Tr. 141, 212.

On September 8, 2000, physical therapist Candace Shorack evaluated Mr. Leitheiser for

the Injured Workers Program. Tr. 135-36. In her opinion, Mr. Leitheiser could sit for 30 minutes

at a time, then needed to change position for 15 minutes. He could alternate in this manner for a

total of four hours in an eight hour day. Ms. Shorack's assessment was that Mr. Leitheiser could

stand for 30 minutes before needing to change position for 20 minutes, and that he could

alternate in this manner for a total of two hours in an eight-hour day. He was able to walk for 10

minutes, with a postural change of 20-30 minutes, for a total of three hours in an eight hour day.

Tr. 135-36. She thought Mr. Leitheiser's lifting and carrying ability was limited to 10 pounds

maximum. Reaching was also limited, because of limitations with range of motion in the

---

[1] *See* 20 C.F.R. § 416.965 (Work experience "means skills and abilities you have
acquired through work you have done which show the type of work you may be expected to do. .
. . We consider that your work experience applies when it was done within the last 15 years,
lasted long enough for you to learn to do it, and was substantial gainful activity. We do not
usually consider that work you did 15 years or more before the time we are deciding whether you
are disabled applies. . . . If you have no work experience or worked only off-and-on or for brief
periods of time during the 15-year period, we generally consider that these do not apply.").

shoulder and a decrease in trunk flexibility. Tr. 135-36. She wrote, "He should be able to work full-time at a job which allows alternating positions and erect standing posture and a supportive chair." Tr. 136.

In December 2001, occupational therapist Travis Hoffman conducted a work tolerance evaluation on Mr. Leitheiser. Tr. 149-53. Mr. Hoffman wrote that Mr. Leitheiser "passed all of the maximum voluntary effort tests, indicating full effort in testing . . . and validating the information contained in this evaluation." Tr. 150. Mr. Hoffman wrote that Mr. Leitheiser had "significant active range of motion limitations about his low back," with all measurements provoking pain, particularly side-bending to the left and forward-bending at the waist. Tr. 150-51. Mr. Hoffman observed that it was "quite obvious that [Mr. Leitheiser]'s shoulders were shifted to the left in relationship to his hips," and that Mr. Leitheiser's left leg was approximately one inch shorter than his right. Tr. 152. Mr. Hoffman wrote, "It appears that the lateral shift and leg-length discrepancy may account for much of [Mr. Leitheiser]'s discomfort." *Id.*

Although Mr. Leitheiser said he could sit for 30 minutes at a time, in Mr. Hoffman's opinion, Mr. Leitheiser was only able to sit for a maximum of 20 minutes, requiring "many postural corrections to include his most comfortable position, bent forward with his upper body weight resting on the table." Tr. 151.  Although Mr. Leitheiser said he could stand for 30 minutes at a time, Mr. Hoffman observed, "At no point during the evaluation was [Mr. Leitheiser] able to stand for longer than 20 minutes before actively seeking a place to sit and rest." *Id.* Mr. Hoffman observed that when walking, Mr. Leitheiser showed "a moderate slow pace, shortened right stride length, and mild limp." *Id.* Mr. Hoffman also observed that Mr. Leitheiser appeared "quite guarded and braced about his lower back during walking." *Id.*

Opinion and Order, Page 4

Mr. Hoffman thought Mr. Leitheiser was limited to work at the sedentary to light exertional level, with lifting from floor level and lifting overhead limited to 15 pounds occasionally and carrying at waist level to 20 pounds occasionally. Tr. 149. He assessed Mr. Leitheiser as able to push and pull up to 10 pounds occasionally. *Id.* Mr. Hoffman wrote that Mr. Leitheiser needed to change position between sitting and standing frequently, with sitting and standing limited to 30 consecutive minutes. *Id.* Mr. Hoffman thought Mr. Leitheiser could meet the physical demand requirements of a job described as call center worker,

> except for the prolonged sitting described in the job analysis for up to 60 minutes
> at one time and 7+ hours per day. I believe this may be modified by getting Mark
> a sit/stand work station that allows him to change position more frequently. If this
> is considered, be sure that the sit/stand option on the table is power actuated
> rather than having to reach or duck under the desk to use hand controls to raise
> and lower the desk, as Mark does not tolerate forward bent or crouched positions.

*Id.* Mr. Hoffman also suggested that Mr. Leitheiser return to work half-time, gradually increasing his hours as tolerated. Tr. 153.

Mr. Leitheiser was treated for pain by Peter Kosek, M.D., between July 1999 and December 2002. Tr. 125-134, 137-48, 192-211. Dr. Kosek noted that the surgeries, epidural injections, physical therapy, and a transcutaneous electrical nerve stimulator ("TENS") unit had been unsuccessful in alleviating Mr. Leitheiser's back pain. Tr. 143. Dr. Kosek prescribed medications for Mr. Leitheiser's back pain, with which Mr. Leitheiser had been compliant. Mr. Leitheiser was reluctant to take narcotics because he had a history of drug abuse; in any event, he reported that narcotics did not help his pain. Tr. 133, 138, 141, 144-45. Dr. Kosek thought Mr. Leitheiser showed evidence of a mood disorder. Tr. 142, 144-45.

On March 15, 2001, Dr. Kosek wrote that although Mr. Leitheiser had had vocational retraining as an optician, the increased activity reportedly worsened his back pain. Tr. 132. On June 8, 2001, Dr. Kosek wrote that the optician job required "continuous standing" and that Mr. Leitheiser's "physical capacity evaluations specifically indicated that he was not capable of this activity continuously." Tr. 129. "For that reason, he has discontinued that trial of employment." *Id.* Dr. Kosek wrote that Mr. Leitheiser's pain had not improved. Tr. 128. Examination revealed myofascial tenderness of the left lower lumbar spine, but normal range of motion and strength in both arms and legs. Tr. 130.

On March 19, 2003, Mr. Leitheiser was examined by neurologist James Watson, M.D., and orthopedic surgeon Bryan Laycoe, M.D. to close his worker's compensation claim. Tr. 212-18. They noted that Mr. Leitheiser had had four surgical procedures for a herniated disc at L5-S1: laminectomy and discectomy; laminectomy and fusion of L5-S1, a take down of the fusion at L5-S1 in August 1995, and finally a repeat fusion of L5-S1 with discectomy in April 1998. Tr. 212, 216. The doctors wrote, "Our findings confirmed the original diagnoses and concluded the situation represented a 'failed back syndrome,' no longer on narcotic medications." Tr. 212.

The doctors concluded that "[f]urther curative measures do not appear to be in order," that Mr. Leitheiser's condition was "fixed and stable," and that "permanent partial disability has resulted." Tr. 217. The doctors also opined that in addition to the objective findings, "[i]t is clear that there is a profound "psychological component in his symptom complex." Tr. 217.

On March 12, 2005, Mr. Leitheiser saw Peter Verhey, M.D. Upon examination, Dr. Verhey noted that Mr. Leitheiser had "severely limited thoracolumbar range of motion" and a "marked paravertebral tenderness" in his mid and lower back. Tr. 178. Dr. Verhey found

diminished reflexes bilaterally and positive straight leg raises bilaterally in both sitting and supine positions, tr. 178-79 [2] as well as a slow gait and an inability to perform heel and toe walking due to pain. Tr. 177-78. Dr. Verhey diagnosed "marked lumbar spine degenerative changes and surgical changes," as well as a "long history of low back pain," "loss of strength," and "difficulties with slow gait." Tr. 179. Dr. Verhey thought Mr. Leitheiser was capable of unrestricted sitting so long as he could "vary his position frequently." In addition, "[p]ostural limitations would include those that would require lots of thoracolumbar flexion and extension or lateral bending." Tr. 179.

On April 13, 2005, reviewing physician Martin Lahr, M.D. completed a Social Security form entitled, "Physical Residual Functional Capacity Assessment." Tr. 182-190. Dr. Lahr opined that Mr. Leitheiser was capable of occasionally lifting up to 20 pounds and frequently lifting up to 10 pounds. Tr. 183. Dr. Lahr thought Mr. Leitheiser capable of standing or walking about six hours out of an eight-hour work day and sitting for about six hours in an eight-hour work day. *Id.* Mr. Leitheiser was limited to only occasional climbing, balancing, stooping, kneeling, crouching, or crawling. Tr. 184. These capacities and limitations made Mr. Leitheiser physically capable of light work with some postural restrictions. Tr. 187. Dr. Lahr's assessment was confirmed by Richard Alley, M.D. Tr. 190.

Mr. Leitheiser was given an orthopedic examination on September 28, 2009 by Kurt Brewster, M.D., an internist. Tr. 334-60. Dr. Brewster wrote that "[p]ain behavior dominated

---

[2] The straight leg raising test involves having the examiner raise the patient's leg with the knee straight while the patient is lying flat on his back. Back pain or leg pain in the involved leg indicates nerve root irritation and possible disc herniation. Clinical Examination Terminology, MLS Medical Reference, available at: https://www.mis-ime.com/articles.

exam," and that Mr. Leitheiser "has give-way during motor testing not reasonable for one who is ambulatory without assistive device." Tr. 353. Dr. Brewster assessed Mr. Leitheiser as able to sit two hours at a time, for a total of four hours in an eight-hour work day; stand one hour at a time, for a total of two hours in an eight-hour work day; walk one hour at a time, for a total of two hours in an eight-hour work day; and lift and carry up to 20 pounds frequently. Tr. 355-59.

On October 14, 2009, William McConochie, Ph.D., performed a psychological evaluation on Mr. Leitheiser, to clarify possible evidence of somatoform disorder and depression. Tr. 362-366. Dr. McConochie considered the evaluation to be reliable and valid, with the results being "consistent internally and with background information." Tr. 362. Dr. McConochie observed that Mr. Leitheiser "seemed constrained emotionally by back pain." Tr. 364. In Dr. McConochie's opinion, Mr. Leitheiser's psychological limitation with respect to work activity appeared to be "the distraction of chronic back pain. Prognosis for improvement in this is poor, as it has not changed over several years, in spite of medical treatments." Tr. 366. Dr. McConochie diagnosed Mr. Leitheiser with an adjustment disorder with depressed mood, chronic, secondary to back pain. He did not believe that Mr. Leitheiser had a somatoform disorder because he did not have a history of anxiety or depression prior to the back problems and the back problems were "medically well-documented." Tr. 365.

In Dr. McConochie's opinion, Mr. Leitheiser had moderate to severe limitations on his ability to sustain concentration, attention, and persistence. Tr. 366. Dr. McConochie completed a Social Security form entitled "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" and assessed Mr. Leitheiser as having a moderate limitations on the ability to understand and remember simple and complex instructions. Tr. 368. He found Mr. Leitheiser

to have marked limitations in the ability to carry out complex instructions and to make judgments on complex work-related decisions. *Id.*

**B.    Hearing Testimony**

Mr. Leitheiser testified at the hearing that the pain in his lower back had continued to worsen since the previous hearing of 2007. When asked by the ALJ whether he had had any recent treatment, Mr. Leitheiser responded that he did not have insurance "so it's hard to go to doctors." Tr. 418. He said the last time he saw a doctor was "probably in an emergency room," *id.,* "at least five years ago." Tr. 419. Mr. Leitheiser said he had stopped going to the emergency room because "all they do is refer me to a doctor, and I can't see him without no insurance." *Id.* Mr. Leitheiser testified that he could not "even basically really put my own shoes on" because of pain. Tr. 420.

The ALJ called a vocational expert ("VE"), Kathleen O'Gieblyn. *Id.* The ALJ asked her to consider a hypothetical individual Mr. Leitheiser's age, having a marginal education, without past relevant work, with the physical ability to lift 20 pounds occasionally and 10 pounds frequently; stand and walk in combination for a total of four hours out of an eight-hour workday; and sit for a total of four hours out of an eight-hour workday, with the option of being able to alternate between sitting and standing at will. Tr. 422. The individual would also be limited to performing tasks "no more complex than one to three steps," and unable to climb ladders, ropes, or scaffolds. *Id.*

The VE opined that such an individual could perform three jobs. The first was  small products assembler, identified in the Dictionary of Occupational Titles ("DOT") as number 739.687-030. Although the DOT defined it as a light job the VE opined that it "can be performed

at the sedentary level also, depending on what product it is that's being assembled." *Id.* Asked by the ALJ whether any of the light exertion jobs identified could be performed with a sit/stand option, the VE responded, "Yes, particularly if the table that you're working at is at chest height, which I have definitely seen." Tr. 422-23. To reflect the necessity of the sit/stand option, the VE reduced the number of available jobs, estimating that about 25% of the jobs remained. Tr. 423.

The second job identified by the VE was hand packager, DOT 920.587-018, a job that could be "performed up to the medium level, but there are a number of sedentary and light positions, again depending on what you are packaging, whether it's light or heavy." Tr. 423. The VE testified that the DOT "has it up to medium, but I'm going to qualify what I'm saying, qualify the DOT." *Id.* She opined that in Oregon there were 898 such positions at the light exertion level, and 100 at the sedentary level. *Id.* Asked how many of the light jobs could be performed with a sit/stand option, the VE answered, "it's exactly what my answer was for assembly small products." Tr. 424. The ALJ asked, "Remaining only 25 percent, then?" The VE answered, "Yes." *Id.*

The third job identified by the VE was an outside delivery job, delivering light products "such as medical supplies, x-rays, pizzas," DOT 230.663-010. *Id.* Asked by the ALJ, "How would this permit a person to spend only four hours of the day sitting down," the VE responded, "Well, it's a[n] in and out, drive for a while, stand, walk." *Id.*

Mr. Leitheiser's attorney asked the VE, "[I]sn't light work defined as being on one's feet six hours a day?" The VE responded, "Yes, but the DOT also, a job can be described as light depending on how much you carry, or it can look at the standing/walking position." Tr. 425. The VE acknowledged, however, that the delivery job would not allow an individual to sit or stand at

will. *Id.* The VE identified a fourth job, that of surveillance system monitor, DOT 379.367-010, a sedentary position with the option of changing position at will. Tr. 425.

## C.     The Sequential Evaluation

The Commissioner has established a five-step sequential process for determining whether a person is disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920. At step one, the Commissioner determines whether the claimant is engaging in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner proceeds to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert,* 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the impairment is severe, the evaluation proceeds to the third step, where the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert,* 482 U.S. at 140-41. If a claimant's impairment meets or equals one or more of the listed impairments, the claimant is considered disabled without consideration of age, education or work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant shows an inability to perform past

work, the burden shifts to the Commissioner to show, in step five, that the claimant has the

residual functional capacity ("RFC") to do other work in consideration of the claimant's age,

education and past work experience. *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f),

416.920(f).

**D.      The ALJ's Decision**

**1.      Mandate to ALJ on Remand**

The parties' stipulation for remand, dated June 4, 2009, stated that the ALJ was to: (1)

give further consideration to the treating, examining, and nonexamining source opinions,

including the opinion evidence provided by Martin B. Lahr, M.D. and Richard Alley, M.D.; (2)

as appropriate, ask treating and examining sources to provide additional evidence or clarification

of their opinions; (3) give further consideration to the information provided by Travis Hoffman

in accordance with SSR 06-03p; (4) consider the lay witness evidence, specifically the

information from Tammy Atkinson, and, if necessary, contact Ms. Atkinson for clarification of

her observations; (5) further evaluate Mr. Leitheiser's subjective testimony, and specifically

consider Mr. Leitheiser's reasons for not obtaining continuing medical treatment and medication;

and (6) reconsider Mr. Leitheiser's maximum residual functional capacity and obtain evidence

from a vocational expert. Tr. 276-77.

In its order remanding the case to the ALJ, dated June 19, 2009, the AC noted that the

hearing decision did not show consideration of the opinion evidence provided by reviewing

physicians Martin Lahr and Richard Alley that Mr. Leitheiser had the residual functional

capacity for light exertion, with postural limitations, and directed the ALJ to discuss this

evidence. Tr. 281. The AC also noted that the ALJ had not articulated the weight given to the

opinion evidence of the reviewing physicians, the examining physicians, and Mr. Leitheiser's treating physicians. *Id.* The AC wrote, "Because there are no findings or rationale that addresses the weight given to the medical sources in the record, the decision is unclear as to which medical sources the [ALJ] relied upon when he assessed the claimant's residual functional capacity." Tr. 282.

The AC stated that the hearing decision did not show adequate consideration of the physical capacity evaluation by Travis Hoffman, including the failure of the ALJ to consider all of the limitations suggested by Mr. Hoffman. *Id.* Nor did the hearing decision "provide rationale with sufficient reasoning for finding the claimant not credible." *Id.* The AC wrote that the ALJ's credibility finding was based on Mr. Leitheiser's failure to obtain treatment and medication, but the ALJ's decision did not "show consideration of the allegation that the claimant was unable to afford or obtain health care." *Id.* Finally, the AC found that the hearing decision did not contain "rationale with sufficient reasons for rejecting the observations reported by Linda Atkinson, the claimant's friend." Tr. 283. While the ALJ had found that Ms. Atkinson appeared to be "basing her reports not on personal observations, but on the reporting of the claimant," it appeared to the AC that there was "nothing in the record which suggests that Ms. Atkinson['s] statements are not based on her personal observations." *Id.*

The ALJ was directed to: (1) give further consideration to the treating and examining source opinions, including Doctors Lahr and Alley, with a rationale explaining the weight given to such evidence and articulating the reasons for the weight given; (2) further consider the information about Mr. Leitheiser's limitations from Travis Hoffman; (3) give further consideration to the evidence from Tammy Atkinson, along with a rationale for the weight given

to the testimony and, if rejected, providing reasons for doing so. Tr. 283-84. If the ALJ found

any aspect of Ms. Atkinson's testimony questionable, he or she was to contact Ms. Atkinson.

Tr. 284. The ALJ was also directed to evaluate further Mr. Leitheiser's subjective testimony and

provide a rationale showing consideration of all Mr. Leitheiser's reasons for not obtaining

medical treatment. The ALJ was also to give further consideration to Mr. Leitheiser's RFC, with

references to the record in support of any assessed limitations and a function-by-function

assessment of his ability to do work-related physical and mental activities and the maximum

amount of each work-related activity Mr. Leitheiser could do. Tr. 284.

      **2.**        **ALJ's Decision**

      At step one, the ALJ found that Mr. Leitheiser had not engaged in substantial gainful

activity since November 15, 2004. Tr. 264. At step two, the ALJ found that Mr. Leitheiser had

the severe impairments of back pain, status post multiple lumbar surgeries, and adjustment

disorder with depressed mood. *Id.* At step three, the ALJ found that neither of the severe

impairments, alone or in combination, met or medically equaled one of the listed impairments.

*Id.* At step four, the ALJ found that Mr. Leitheiser could do light work with the option to

alternate at will between sitting and standing, and limited to performing one to three-step tasks

"equivalent with unskilled work." Tr. 266. At step five, the ALJ found that Mr. Leitheiser had

the ability to perform the jobs of small products assembler, hand packager, and surveillance

system monitor. Tr. 271.

      The ALJ found Mr. Leitheiser's statements about his symptoms "not credible to the

extent they are inconsistent with the above residual functional capacity assessment." Tr. 267. She

wrote, "Although some pain is to be expected from his back condition, Mr. Leitheiser's failure to

give good, consistent effort and his presentation with exaggerated pain behaviors limit the reliability of his reporting." Tr. 269. The ALJ gave

> significant weight to the opinion of Dr. Brewster because his findings are consistent with the objective evidence of record as a whole. This examination demonstrated Mr. Leitheiser's tendency toward symptom magnification; nevertheless, he does have a significant history of surgeries and attendant limitations on functioning which Dr. Brewster found . . . .

Tr. 270. The ALJ gave "some weight" to Dr. McConochie's opinion, but "only to the extent it documents psychological conditions and their impact on Mr. Leitheiser's functioning." The ALJ explained that Dr. McConochie's "comments regarding Mr. Leitheiser's significant inability to concentrate secondary to his allegations of continuous and debilitating pain is outside the scope of the requested psychological assessment." Tr. 270.

The ALJ wrote that "[w]hile Mr. Hoffman identified greater limitations than contained in the RFC herein," she gave his opinion "minimal weight" because Mr. Hoffman's "examination occurred 14 months before Mr. Leitheiser's industrial injury was certified as having achieved maximum medical improvement;" consequently the limitations found by Mr. Hoffman "are not necessarily indicative of his functioning" at the time he alleged his disability began. The ALJ did, however, "give great weight to Mr. Hoffman's assessment, insomuch as he concluded that Mr. Leitheiser is capable of working at a less than light exertional level with a sit/stand option, which is consistent with the whole of the evidentiary record." Tr. 267-68.

### III.  STANDARD OF REVIEW

The Court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999). In determining whether the Commissioner's findings are

supported by substantial evidence, the Court must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's decision must be upheld even if "the evidence is susceptible to more than one rational interpretation." *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995).

The initial burden of proving disability rests on the claimant. *Meanel*, 172 F.3d at 1113. To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

## IV.  DISCUSSION

Mr. Leitheiser asserts that the ALJ failed to follow the mandate of the district court and the AC by: (1) again providing inadequate reasons for finding Mr. Leitheiser not credible; (2) giving the opinion of physical therapist Travis Hoffman "great weight," but failing to consider the part of Mr. Travis's opinion establishing Mr. Leitheiser's disability; (3) disregarding the work tolerance report of physical therapist Candace Shorack;  (4) failing to consider the opinions of the two reviewing physicians, Richard Alley, M.D., and Martin Lahr, M.D.; and (5) providing inadequate reasons for rejecting the lay witness testimony of Tammy Atkinson.

A.        **Credibility Determination**

The ALJ found that Mr. Leitheiser had both physical and mental impairments that were

severe, and that Mr. Leitheiser had shown the existence of medically determinable impairments

that could reasonably be expected to cause some of the alleged symptoms. Mr. Leitheiser's

testimony could therefore be rejected only upon a finding of "affirmative evidence" of

malingering or with "clear and convincing" reasons for doing so. *Carmickle v. Comm'r,* 533

F.3d 1155, 1160 (9th Cir. 2008) (absent affirmative evidence that the plaintiff is malingering,

"where the record includes objective medical evidence establishing that the claimant suffers

from an impairment that could reasonably produce the symptoms of which he complains, an

adverse credibility finding must be based on 'clear and convincing reasons' ").

The ALJ rejected Mr. Leitheiser's statements about his symptoms "to the extent they are

inconsistent with" the ALJ's RFC assessment. Tr. 267. Because the ALJ's RFC assessment is not

evidence, much less substantial evidence, the finding is clearly erroneous. *See, e.g., Meanel,* 172

F.3d at 1113 (Commissioner's findings must be supported by substantial evidence in the record).

This court has held in several cases that rejecting a claimant's credibility based upon the

conclusions reached in the ALJ's RFC assessment is error because such an analysis

> reverses the manner in which an ALJ considers a claimant's credibility. The ALJ
> must consider a claimant's symptom testimony in construing the claimant's RFC
> assessment. 20 C.F.R. § 416.945(a)(3); SSR 96-8p at *7 (available at 1996 WL
> 374184). Dismissing a claimant's credibility because it is inconsistent with a
> conclusion that must itself address the claimant's credibility is circular reasoning
> and is not sustained by this court.

*Lowe v. Astrue,* 2011 WL 4345168 * (D. Or. Sept. 15, 2011), *citing Carlson v. Astrue,* 682 F.

Supp.2d 1156, 1167 (D. Or. 2010); *Cohoon v. Astrue,* 2011 WL 3841568 at *5 (D. Or. Aug. 30,

2011); *Young v. Astrue,* 2010 WL 331781 at *5 (D. Or. Jan. 21, 2010).

Opinion and Order, Page 17

In addition, courts have consistently found vague statements insufficient to provide a rationale for an ALJ's finding. *See, e.g., Holohan v. Massinari*, 246 F.3d 1195, 1208 (9th Cir. 2001) (Finding based on "record in general" insufficient to support adverse credibility determination); *Reddick v. Chater,* 157 F.3d 715, 722 (9th Cir. 1998) (general findings insufficient; ALJ must identify what testimony is credible and what evidence undermines the claimant's complaints).

The ALJ's second reason for rejecting Mr. Leitheiser's symptom testimony rested primarily on Dr. Webster's report. The ALJ stated that she had given "significant weight" to the opinion of Dr. Brewster, "because his findings are consistent with the objective evidence of record as a whole." With no further elaboration, this finding is inadequate. *See, e.g., Vasquez v. Astrue*, 572 F.3d 586, 592-93 (9th Cir. 2009) (ALJ's rejection of evidence on ground that it was "not consistent with the objective medical evidence," without further elaboration, insufficient).

The third basis for the ALJ's credibility finding was Dr. Brewster's findings of "pain behaviors," "Wadell's axial loading," "Waddell's simulated rotation," and "give-way during motor testing." *See* Tr. 334, 350, 353. The ALJ found that Dr. Brewster had reported "symptom magnification through inconsistent results on supine versus seated straight-leg raise tests, give-way weakness on muscle testing, pain when lying down, positive Waddell's testing, and exaggerated pain behavior throughout." Tr. 269. The ALJ concluded that "Mr. Leitheiser's failure to give good, consistent effort and his presentation with exaggerated pain behaviors limit the reliability of his self reporting." *Id.* The ALJ appears to have concluded that Dr. Webster's report constituted affirmative evidence of malingering, although nowhere in his report does Dr. Webster state that Mr. Leitheiser is malingering.

The "Waddell test" consists of eight physical findings, or "signs," divided into five categories, of non-organic (or psychological) sources of lower back pain.[3] A finding of three or more signs is "clinically significant," but isolated positive tests are ignored and do not indicate a non-organic component to chronic low back pain. *See* Gordon Waddell et al., *Nonorganic Physical Signs in Low-Back Pain,* 5 Spine 117, 117-25 (Mar.-Apr. 1980). The Waddell test does not, however, distinguish between malingering and psychological conditions. *Id.* The developer of the test, Dr. Waddell, has criticized the use of the test to determine malingering. Main, Chris J.; Waddell, Gordon, *Behavioral Responses to Examination: A Reappraisal of the Interpretation of "Nonorganic Signs,"* Spine 23(21):2367-2371 (November 1, 1998):

> Perhaps the most serious misuse and misinterpretation of behavioral signs has occurred in medicolegal contexts. The signs frequently are used as an indication of faking or simulated incapacity. . . . [H]owever, behavioral signs may be learned responses to pain that have developed since the original injury and of which the patient is largely unaware. Even if the behavioral signs are assumed to be under voluntary control, however, and if the patient is consciously responding in a guarded manner, it cannot be assumed de facto that the signs are evidence of simulation for the purpose of financial gain. . . .

> The behavioral signs are not on their own a test of credibility or veracity. Interpretation of the signs is only possible within the context of a broader clinical or psychosocial assessment.

In an unpublished decision, *Wick v. Barnhart,* 173 Fed. Appx. 597, 2006 WL 584749 *1

---

[3] The eight signs are: (1) superficial tenderness of the skin to light touch; (2) tenderness that crosses multiple somatic boundaries, called nonanatomic tenderness; (3) back pain reported upon pressing down on the top of the head (axial loading); (4) back pain when the shoulders and pelvis are rotated in unison (simulated rotation); (5) inconsistent results in straight leg raising; (6) numbness that does not follow neurologic patterns; (7) the sudden letting go of a muscle, described as "giving way," or "breakaway" weakness; and (8) overreaction or exaggeration of symptoms (pain behaviors). *See, e.g.,* Kiester PD, Duke AD. *Is It Malingering, or Is It "Real?":* *Eight Signs that Point to Nonorganic Back Pain,* Postgrad. Med. 1999; 106(7):77-84, *available at http://www.postgradmed.com.*

(9th Cir. Mar. 10, 2006) the Ninth Circuit cautioned against the use of the Waddell test when

making credibility determinations, noting that "the Waddell test does not by itself constitute

'affirmative evidence' of malingering." *See also Reinertson v. Barnhart,* 127 Fed. Appx. 285,

289 (9th Cir. 2005) (where doctor noted two Waddell's signs but did not ascribe any significance

to those signs, ALJ's conclusion that doctor had documented "functional behavior" not

supported by substantial evidence); *Kershner v. Massanari,* 16 Fed. Appx. 606, (9th Cir. 2001)

(ALJ's finding that two of doctors' reports described "behavior consistent with malingering,"

based on positive Waddell's findings, was erroneous).

　　　　This court has also concluded that references to Waddell's test in the medical record do

not support a finding of malingering or an adverse credibility determination. In *Anderson v.*

*Astrue,* 2011 WL 1655552 at *8 (D. Or. March 25, 2011), a case also involving a physical

examination by Dr. Brewster with Waddell's findings, the court noted,

> Dr. Brewster did not indicate whether the Waddell sign was attributable to
> malingering or psychological condition. Moreover, Dr. Brewster did not assign
> any significance to the positive Waddell sign in his conclusion. Consequently, the
> ALJ's finding that the Waddell sign indicated that Anderson's pain testimony was
> not fully credible is not supported by substantial evidence.

*Oetinger v. Astrue,* 2011 WL 44063308 *5 (D. Or. Aug. 23, 2011). Here, too, Dr. Brewster did

not indicate whether his findings were attributable to malingering or a psychological condition.

The ALJ's adverse credibility finding is further undermined by the presence of significant

evidence in the record that Mr. Leitheiser's pain response is psychological. Dr. Kosek, who

treated Mr. Leitheiser for three years, diagnosed Mr. Leitheiser with a mood disorder. Doctors

Watson and Laycoe found a "profound psychological component" to Mr. Leitheiser's pain.

Dr. McConichie diagnosed an adjustment disorder with depressed mood. The court concludes,

therefore, that the ALJ's adverse credibility finding based on Dr. Brewster's report was both legally erroneous and unsupported by substantial evidence in the record.

Finally, the ALJ discredited Mr. Leitheiser because he had "chosen not to seek medical care." Tr. 269. The ALJ stated that she had "fully considered whether this failure was due to a lack of financial support," and determined that it was not because Mr. Leitheiser had been told at the previous hearing that low cost and free medical services were available in his area, and because he was "entitled to continuing medical care from his industrial injury claim if he can document worsening of his condition," but found it "inconvenient to seek out a physician who can assist him in this regard." Tr. 269.

The ALJ's finding is based on assumptions rather than substantial evidence in the record. The evidence suggests that for Mr. Leitheiser, further medical treatment would be futile. Doctors Watson and Laycoe concluded in March 2003 that "[f]urther curative measures do not appear to be in order," that Mr. Leitheiser's condition was "fixed and stable," and that "permanent partial disability has resulted." Tr. 217. The ALJ relied on this evidence to find that Mr. Leitheiser had reached "his maximum level of improvement" and to reject a portion of Mr. Hoffman's report on that basis. The ALJ's conclusion that Mr. Leitheiser was not credible because he had "chosen" not to obtain additional treatment or found it inconvenient to do so is, therefore, unsupported by the evidence.

**B.     Opinion of Travis Hoffman**

Mr. Leitheiser asserts that the ALJ erred in giving "great weight" to that portion of Mr. Hoffman's opinion concluding that Mr. Leitheiser was capable of working at a less than light exertional level with a sit/stand option, but giving "minimal weight" to "the findings of Mr.

Hoffman which are inconsistent with the RFC herein" because Mr. Hoffman's assessment was completed before Mr. Leitheiser reached his "maximum level of improvement" in February 2003, the date of the closing examination by Doctors Watson and Laycoe. Mr. Leitheiser argues that the ALJ has taken Mr. Hoffman's opinion about his work capacity out of context, because Mr. Hoffman qualified his opinion that Mr. Leitheiser could work as a call center operator by saying Mr. Leitheiser would need the modification of an adjustable work station and would need to start out working part-time.

As discussed above, the ALJ's rejection of evidence on the ground that it conflicts with the ALJ's own RFC findings is merely circular reasoning unsupported by the evidence. The ALJ's decision to give part of Mr. Hoffman's report "minimal weight" on the ground that it was written before the finding of maximum improvement is plausible but for the fact that the ALJ has given other parts of the report, written at the same time, "great weight." The ALJ gave no other rationale for differing weights assigned to parts of the same report.  The court concludes that the ALJ's findings with respect to Mr. Hoffman's report are erroneous and unsupported by substantial evidence in the record.

**C.**     **Work Tolerance Report of Candace Shorack**

Mr. Leitheiser asserts that the ALJ's failure to consider Ms. Shorack's work tolerance report was error. I disagree. Ms. Shorack submitted the work tolerance report in 2000, four years before Mr. Leitheiser's alleged onset date. Medical opinions that predate the alleged onset of disability are of only limited relevance. *Carmickle*, 533 F.3d at 1165. I find no error here.

**D.**     **Opinions of Doctors Alley and Lahr**

Although the ALJ did not comply with the instruction by the district court and the AC to make findings on the opinions of these reviewing physicians, the ALJ's RFC assessment is consistent with their findings. I find no error in the ALJ's failure to consider their 2005 reports because their remoteness in time limits their relevance. *Id.*

**E.    Rejection of Lay Witness Testimony**

In a third-party report dated June 12, 2005, Ms. Atkinson stated that Mr. Leitheiser was unable to get dressed by himself, wash, shampoo, and brush his hair, cook, or do any housekeeping or yard work. Tr. 108. She wrote that he could "maybe microwave a meal one time a week" but was unable to prepare meals for himself. Tr. 111. She added that the pain in Mr. Leitheiser's back was "severe" and that he could only go outside for about 15 minutes a day. Tr. 112. She said he needed help to get groceries, but was able to watch TV if he was "able to sit comfortably," Tr. 109. She reported that he could walk about a block. Tr. 110. She concluded, "Marcus has an extremely hard time with everyday task[s] due to his back injuries." Tr. 114.

At the first hearing, Mr. Leitheiser's mother, Marlow Leitheiser, testified that her son lived with her. Tr. 392. She stated that he did not "do much other than take his dog for a walk, which is a field right across the street from where we live." Tr. 393. Asked whether Mr. Leitheiser did anything around the apartment, she responded, "Nothing. Lays and sleeps most of the time or just sits." Tr. 394. She explained that by the look on his face he was in pain. Tr. 395. She said that "even to get him to go to the grocery store with me is a . . . big thing." Tr. 395. When he did go to the grocery store with her, "[a] lot of times he'll end up going out and sitting in the car and waiting for me." Tr. 400.

The ALJ rejected the testimony of Mr. Leitheiser's mother at the earlier hearing and the

written statement of Ms. Atkinson because, although they were consistent with Mr. Leitheiser's
self-reported activities, "his choice to restrict his efforts is not medically based as far as the
objective medical findings of record can support." Tr. 269. This finding is difficult to interpret:
the ALJ appears to be saying that the lay witnesses are not credible because their observations
are belied by Mr. Leitheiser's voluntary restriction on his own activities in a manner that is
unsupported by the medical findings. The medical findings in question were "[i]maging studies
obtained since Mr. Leitheiser's last surgery," which had not "revealed any major abnormalities."
*Id.*

The ALJ is required to give specific reasons, germane to the lay witness, in order to
discount lay testimony. *Bruce v. Astrue,* 557 F.3d 1113, 1116 (9th Cir. 2009). In aggregating the
testimony of Ms. Leitheiser and Ms. Atkinson, the ALJ failed to satisfy the requirement of
giving reasons that were specific to each witness. The ALJ's finding that Ms. Leitheiser and
Ms. Atkinson were not to be believed because their observations were based on Mr. Leitheiser's
choice "to restrict his efforts" may reflect on Mr. Leitheiser's credibility, but it is not germane to
the credibility of Ms. Leitheiser and Ms. Atkinson.

The ALJ's third reason for rejecting  their testimony was "imaging studies obtained since
Mr. Leitheiser's last surgery," *i.e.*, x-rays showing no evidence of fracture, destructive lesion, or
spondylolisthesis and a report from Doctors Watson and Laycoe finding "no evidence of
recurrent or persistent spondylolisthesis." Tr. 212.[4] Although some cases have held that the ALJ
may discount lay testimony because it conflicts with medical evidence, *see, e.g., Lewis v. Apfel,*

---

[4] It should be noted, however, that despite this opinion, Doctors Watson and Laycoe
concluded that Mr. Leitheiser had a permanent partial disability. Tr. 217.

236 F.3d 503, 511 (9th Cir. 2001) and *Bayliss v. Barnhart,* 427 F.3d 1211, 1218 (9th Cir. 2005),

the ALJ does not explain how the lay witness testimony conflicts with medical evidence that Mr.

Leitheiser's back pain cannot be attributed to fracture or spondylolisthesis. The medical evidence

consistently indicates that the cause of Mr. Leitheiser's back pain is "failed back syndrome," or,

as found by Dr. Verhey, "marked lumbar spine degenerative changes and surgical changes," as

well as the psychological conditions noted by Doctors Watson, Laycoe, and McConochie.

The absence of an explanation from the ALJ about why the absence of fracture or

spondylolisthesis undermines the lay testimony is made more puzzling by the fact that the ALJ

found at step two that Mr. Leitheiser had a severe back impairment that "could reasonably be

expected to cause some of the alleged symptoms" then rejected Ms. Atkinson's statement that

Mr. Leitheiser's back injury was severe. Tr. 267.

## V.  CONCLUSION

The ALJ's rejection of Mr. Leitheiser's testimony and the lay testimony of Ms. Leitheiser

and Ms. Atkinson is legally erroneous and unsupported by substantial evidence in the record.

Sentence four of 42 U.S.C. § 405(g) gives the court discretion to decide whether to remand for

further proceedings or for an award of benefits. *Harman v. Apfel*, 211 F.3d 1172, 1179 (9th Cir.

2000).  In *Smolen v. Chater,* 80 F.3d 1273, 1292 (9th Cir. 1986), the court held that improperly

rejected evidence should be credited and an immediate award of benefits be made when: (1) the

ALJ has failed to provide legally sufficient reasons for rejecting such evidence; (2) there are no

outstanding issues that must be resolved before a determination of disability can be made; and

(3) it is clear from the record that the ALJ would be required to find the claimant disabled were

such evidence credited. These three conditions are met here.  Accordingly, this case is reversed

and remanded for the payment of benefits.

IT IS SO ORDERED.

DATED this 16th day of March, 2012.

_/s/ Michael H. Simon
Michael H. Simon
United States District Judge